Our second case this morning is number 18-1546 Fry v. Wilkie. Our counsel for the second case here. Okay, Mr. West. Thank you, Your Honor. My name is Travis West. I'm here from Wanakie, Wisconsin to represent Sergeant Richard E. Fry, a U.S. Army retired medically in 1971. Sergeant Fry is— Mr. West. Yes, Your Honor. You have a superficially attractive case because of Esteban v. Brown, but you're making a clear and unmistakable error argument. And Brown is later in time, so it wasn't available. Doesn't that get your argument? I think not, Your Honor, because there are a couple of things that we think that the Veterans Court missed. Some of which— You don't have Brown in your camp. We respect that, Your Honor. And we are not relying on post-1996 decisions in order to say that the court and, in fact, the agency made a clear and unmistakable error in 1971. What we point to is actually the language of the regulations themselves. So the Veterans Court took the position that because 4.14 was considered to be ambiguous at the time, that anti-permitting rule allowed the agency to determine that a missile that passed through one section of the body in order to ultimately lodge in a different section, the agency could rate just the final destination of that missile. In this case, the muscle group of the chest cavity rather than—and without rating the other systems that that missile passed through to reach that body, which in this case was the skin. We point to a couple of reasons why that's an impermissible conclusion now and would have been impermissible in 1971 and against the canons of construction that existed then as they do now. One of which we addressed extensively in the brief, which is by taking this approach, the agency— I'm sorry. Just so I understand your point of view, are you saying that the RO in 1971 did not take into account Mr. Fry's scar when it was making an assessment of how much benefits to give him for the muscular skeletal injury? I think the answer to that question is both yes and no, Your Honor. I mean, they do say scar among the other things that they saw that were problematic. That's correct. And we believe that Section 4.56 of the code as it existed back then does direct them to take into account the scar, but it's not for the purpose that the government has argued here. If you look at the exact language of that provision, it tells the VA that it must take into account the scars that exhibit the entrance and exit wounds in order to determine the path that the missile traveled. The VA only relied on that provision. We don't, Your Honor. Well, that's the problem. It seems to me there's general language about scars, and we really can't tell from that whether the RO in 1971 failed to consider this painful scarring rating provision, right? Your Honor, I think that as the code reads, the RO would have had to take the scar into account for both purposes, but for different reasons. Yeah, but your problem is maybe they did take it into account for both purposes, and can we really tell from the 1971 RO decision that they didn't do that? I think the crux of the problem—first, let me answer that question. I don't know that I can positively answer that question. I can't look to anything in the record and say that they took the scar into account with respect to rating under 5303 and also took the scar into account and decided not to rate under 7804. What our argument is, Judge, is that even if they took it into account in both respects, they are still prohibited by the plain language of the regulations from not providing the second rating to the second body system. And the reason for that is because 4.14 is a general regulation that is intended to provide guidance with respect to what the VA and the rating officer does in general. It contains language within it that directs the rating officer to then look to the specific body systems for special instructions. Excuse me. The problem is that if they'd said in 1971 that the anti-pyramiding regulation requires that we look to only one of these scar provisions and not to the other one, then you might have an argument that the construction that was adopted later on should have been adopted in 1971. I mean, I can understand that argument. The problem is that I can't tell what the RO did, and I can't tell that they relied on the anti-pyramiding regulation or that they made a mistake in that respect. Well, I think, Your Honor, that gets to a different issue, which we have been, and we pointed out in the brief, we've been taking issue with from the outset is that we can't tell that either, and it appears to us that the board of the VA... How can you get Q without being able to tell that? It has to be clear and unmistakable. Your Honor, we think that the clear and unmistakable evidence is that you've got a specific regulation that says when looking at the skin body system, you must rate at 10% if these objective findings exist. I know that the government has said that there's a question of that, and we pointed out in our reply brief to where they have made a concession at the lower level that those conditions do exist or did exist in 1971. Our position has been under the rules of construction, the general provision that is provided in 4.14 doesn't... It is trumped by the specific provision that exists in DC 7804. Did I answer your question, Your Honor? Well, I think you did, but it seems to me that we're all agreed that we really can't tell what the board, what the RO did in 1971, and without knowing what they did, it's hard to know whether there's clear and unmistakable error. I think, Your Honor, our position with respect to that is what we know that the board did in 1971 is they didn't... They chose not to rate the skin, the skin condition. They looked at this gentleman who had a nine-inch long, one-inch wide scar on his chest that everybody agrees was painful, and they said, even though the regulation says we must rate this, we're going to eschew the specific and mandatory language in 7804, and we will defer to our interpretation of the more global broad language in 4.14. Our argument is that the rules of construction don't allow the VA to do that now. They would not have allowed the VA to reach that conclusion back in 1971, and the fact that it reached that conclusion, in this case, despite the language in 4.14 telling the VA to look at the specific instructions, despite the mandatory language in the specific instructions constitutes clear and unmistakable error under the case law that's been established. Okay. Want to save the rest of your time for rebuttal? Yes, Your Honor. Thank you. Ms. Moses. Morning, Your Honors. May it please the Court. Assemblyman, Mr. Brown. David Brown, Esteban B. Brown. The Veterans Court explained that even under 38 CFR 4.14's anti-pyramiding permission, a claimant is entitled to separate disability ratings where none of the symptomology for any of the conditions is duplicative of or overlapping with the symptomology of the other two conditions. Where did that test come from? That anti-pyramiding rule that you're... The overlapping, that none of the symptomology is duplicative or overlapping. Where did that symptomology test come from? Did the Esteban Court derive it from the plain language of 4.14? That rule, that language has always existed. What Esteban, the Court in Esteban did was just to clarify that when there is not overlapping or duplicative symptomatology, that separate ratings should be assigned. And that the VA's old practice of looking at the predominant sort of injury or the manifestation of symptoms and rating it under the highest possible rating score that they could for one disabling condition should not be the practice anymore. And that, too, here is reflected in what the rating officer did in this case. I do want to address one point here about the SCAR and Mr. Frye's claim that he was entitled to receive a 10% rating under that. And to clarify, Your Honors, that we do not concede that Mr. Frye met the rating criteria for under 7804. Then or now? I'm sorry? Then or now? Well, what's only important to the clear and unmistakable standard is what happened at the time that the decision was made. Oh, that wasn't my question, though, was it? No, Your Honor, I apologize if I didn't answer your question. I thought that I had. I said then or now. Oh. Now, post-Esteban. He may need it now. I don't know. What we're looking at here is whether he met it in 1971. And looking at the medical examination report on which the rating officer relied upon, which is at Joint Appendix page 68, the physician who examined Mr. Frye in 1971 notes, yes, that the SCAR is tender throughout, but doesn't make any objective findings with respect to the SCAR being painful. And to meet the rating criteria under 7804, the SCAR has to be painful and tender on objective examination. And there's no evidence here that it was painful. So Mr. Frye cannot demonstrate with any certainty that he met the criteria for a 10% rating for the SCAR under Diagnostic Code 7804. I find the government's cavalier attitude towards the veterans, the agency is supposed to be helping, disturbing. Your use of the word may, for example. Well, he may need it now. And while it was tender, it may not have been painful. You're dealing with people who were torn to pieces in the service of their country. And it just seems to me that there ought to be a higher level of sensitivity. I understand, Your Honor. The rating, the maximum rating that was assigned, the 40% under 5303, does reflect that the rating officer took into consideration many factors. Excuse me. As you can, as the rating decision itself reflects on joint appendix page 38 and 39, one of the first, the first disabling, I'm sorry, it's at the bottom of appendix page 38, the first disabling condition that the rating officer indicates is SCAR. And then, I think a helpful comparison here of the diagnostic criteria under 5303 and the examiners, the physical examination, demonstrates that Mr. Frye may not have even met the rating criteria for a maximum rating of 40% under 5303. 5303. So the 40% rating could include the 10% for the painful SCAR. Yes, Your Honor. And that's the, really in comparing the medical evidence that we have here and the rating criteria, the reasonable conclusion is that other factors were considered. And it wasn't just the muscle injury itself, that it was also the SCAR. It may be just other factors as well. Where do we find in the record the various provisions, the SCAR provisions, the rating criteria for the SCAR provision, for SCARs? We include it as an addendum to our brief, Your Honor. We included, I believe, the entire part four, which is the entire schedule for rating disabilities. So which are the ones that apply to SCARs? We have the... Yes, that is, I believe the page numbers are at the bottom. And 7804 is the diagnostic code that governs the SCAR that issue here. And that's on page 273, it's at the bottom. Okay, but I was more interested in the... 5303. In the other provisions. Oh, sure, Your Honor. That is at page 242. 242. Yes, we're in the right column. 5303. Page... So there's quite a range there. Yes, Your Honor. And Mr. Fry received the highest rating available for severe of 40%. And one of the factors here... Well, we don't know that. Do we know that he received the 40% rating under this rating provision? Or is there a possibility that they got to the 40% by adding the painful and tender SCAR? No, Your Honor. We know that it's this one? Yes, Your Honor. How do we know that? The rating decision, which is at appendix, joint appendix page 38. If you look in the left column, what it does, it lists the diagnostic code that the rating officer assigned. And then if you look at the text that's across from it, it lists the disabling conditions that... 5303 would be the diagnostic code, is that what you're saying? Yes, Your Honor. But it says... This is where it's CUA. It says SCAR comma. Yes, Your Honor. And then shell fragmentation. Well, SCAR isn't 5303, I think is what Judge Dyke is saying. Do you see what I'm saying? Yes. What we... I mean, it doesn't... Let me go back to 5303. 5303 more or less identifies an anatomical section of the body. It also doesn't exactly match with the disabling condition that the rating officer described because there just probably isn't one in the schedule. Unable to lie on your side and play sports and so on. So what the rating officers I'm sure still do is that they try to find the diagnostic code that's most analogous to the conditions that are presented. But he does put SCAR in front of that. And I think that is evidence that that was certainly a consideration by the rating officer. But that's what Judge Dyke is asking, I think. Yes. I mean, SCAR is not within 5303, right? That's correct. But it is one of the things that the rating officer can consider when looking at that particular disabling condition. And it was also... Well, but I'm not sure that I understand that because SCAR is not mentioned in 5303. Why is that a relevant consideration under 5303? I guess what I'm asking is, can this decision be read as actually awarding the 10% for the painful and tender SCAR even though it lists this 5303 as the provision? Our position is that Mr. Fry would not have qualified under 7804 because there is no objective evidence of the SCAR being painful. If you're wrong about that, do you lose? No. Because comparing the rating criteria from 5303 and the medical evidence here, it reflects that the rating officer considered more than just the muscle injury itself. It's not absolutely clear that the rating officer did not consider the SCAR when rating, especially to assign... Well, he put SCAR down. Sorry? He wrote SCAR into it. And to assign the most severe level for this particular condition when Mr. Fry's medical evidence often doesn't support that he had limitation of motion with respect to that area. The real answer is you don't know, and that's why it's CUE. I mean, or not CUE. It would not be CUE. Right, right. It doesn't fall within CUE. If it's not absolutely clear that a different result would have ensued, then Mr. Fry can just not meet his burden of establishing clear and unmistakable error. Right. Okay. Thank you. If the court doesn't have any further questions, we respectfully request that the court affirm the Veterans Court's decision. And Mr. West? And, counsel, I apologize if you think that was aimed at you. It's aimed at the agency. I just find this very painful. I wanted to take just a minute, Your Honors, to address the point that the court was just trying to get at, I think, as I understood it, which is whether Sergeant Fry would have qualified for the 40% rating under 5303 whether we know he would have qualified absent that notation of SCAR within the rating sheet that's found in the interview. I don't think that's quite the question. I think the question is whether, having mentioned SCAR, which is not part of 5303, whether there's a possibility that they were upping the rating there to take account of the painful and tender nature of it. And we think the answer to that question, Your Honor, is clear. If the court takes a look at Section 4.72, which is the portion of the code that immediately precedes the 5303 diagnostic code, if you turn to page 242 within the section we were just looking at, the very last sentence on the left-hand column starts with, this section is to be taken as establishing entitlement to a rating of severe grade when there is a history of compound, comminuted fracture, indefinite muscle or tendon damage from the missile. We think that the record, as established in this case, shows. You say that that includes SCAR, a painful and tender SCAR. What we're saying, Your Honor, is that whether the SCAR was there or not, the VA would have been required to rate him at the highest level under that criteria, under that guidance that's given in 4.72. We also, as I mentioned earlier, believe that the VA was required to look at the SCAR, whether they took it into account or not, because the VA has to, as the guidance is given in 4.56, the VA has to look at the SCAR to determine, SCARs to determine what the path was that the missile traveled through the body because it helps to determine the severity of the damage to the muscle underneath. Okay. Anything further? Thank you for your time today. Thank you, Mr. Lewis. Thank both counsel. The case is submitted.